FILED

2013 JUL 12 P 12: 09

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
N. DIST. OF CALIFORNIA

1   Francis O. Scarpulla (41059)
ZELLE HOFMANN VOELBEL & MASON LLP
2   44 Montgomery Street, Suite 3400
San Francisco, CA 94104
3   Telephone: (415) 693-0700
Facsimile: (415) 693-0770
4   *fscarpulla@zelle.com*

5   Daniel R. Shulman (MN 100651)
GRAY, PLANT, MOOTY, MOOTY & BENNETT
6   500 IDS Center
80 South 8th Street
7   Minneapolis, MN 55402
Telephone: (612) 632-3335
8   Facsimile: (612) 632-4335
*daniel.shulman@gpmlaw.com*

9

10

11                **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN FRANCISCO DIVISION**

KAW

14

15   Judy A. Reiber, Craig Buske, Elizabeth Allis,  )   Case No. **CV 13 3233**
and William Elwood, on Behalf of                )
16   Themselves and All Others Similarly           )
Situated,                                        )
17                                                )   **CLASS ACTION COMPLAINT**
Plaintiffs,            )
18                                                )   **JURY TRIAL DEMANDED**
v.                       )
19                                                )
NYK Line (North America) Inc.; Nippon            )
20   Yusen Kabushiki Kaisha; Mitsui O.S.K.         )
Lines, Ltd.; Kawasaki Kisen Kaisha, Ltd.;        )
21   "K" Line America, Inc.; EUKOR Vehicle         )
Carriers, Inc.; Wallenius Wilhelmsen             )
22   Logistics AS; Wilh. Wilhelmsen ASA;           )
Wallenius Wilhelmsen Logistics Americas          )
23   LLC; Compania Sud Americana De Vapores        )
S.A.; Toyofuji Shipping Co., Ltd.; and           )
24   Nissan Motor Car Carrier Co., Ltd.,           )
                                                 )
25                  Defendants.               )
                                                 )
26

27

28

---

                    CLASS ACTION COMPLAINT

Plaintiffs Judy Reiber, Craig Buske, Elizabeth Allis, and William Elwood, indirect purchasers of Vehicle Care Services (defined hereafter), on behalf of themselves and all other similarly situated indirect purchasers, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, and the common law of unjust enrichment, demand a trial by jury, and for their complaint against defendants allege as follows:

## I.   **NATURE OF THIS ACTION**

1.      This is an action brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to secure equitable relief against the defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under the antitrust laws of the State of Minnesota, Minnesota Stat. §§ 325D.52, et seq., to recover damages and secure other relief against the defendants for violations of those laws.  This lawsuit is brought as a proposed class action against Defendants NYK Line (North America) Inc. ("NYK America"), Nippon Yusen Kabushiki Kaisha ("NYK Line"), Mitsui O.S.K. Lines, Ltd. ("MOL"), Kawasaki Kisen Kaisha, Ltd. ("'K' Line"), "K" Line America, Inc. ("'K' Line America"), EUKOR Vehicle Carriers Inc. ("EUKOR"), Wallenius Wilhelmsen Logistics AS ("WWL"), Wilh. Wilhelmsen Holding ASA ("WW Holding"), Wilh. Wilhelmsen ASA ("WW ASA"), Wallenius Wilhelmsen Logistics Americas LLC ("WWL America"), Wallenius Lines AB ("Wallenius"), Compañía Sud Americana De Vapores S.A. ("CSAV"), Toyofuji Shipping Co., Ltd. ("Toyofuji") and Nissan Motor Car Carrier Co., Ltd. ("Nissan") (all as defined below, and collectively the "Defendants"), and unnamed co-conspirators, providers of Vehicle Carrier Services (defined below) globally and in the United States, for engaging in at least a five-year-long conspiracy to fix, raise, maintain and/or stabilize prices, and allocate the market and customers in the United States for Vehicle Carrier Services.

2.      "Vehicle Carriers" transport large numbers of cars, trucks, or other automotive vehicles including agriculture and construction equipment (collectively "Vehicles") across large bodies of water using specialized cargo ships known as Roll On/Roll Off vessels ("RoRos").  As used herein, "Vehicle Carrier Services" refers to the paid ocean transportation of Vehicles by

1

---

CLASS ACTION COMPLAINT

1    RoRo. According to its website, the Port of New York and New Jersey, with its principal

2    activities at the Port of Newark and the adjacent Elizabeth-Port Authority Marine Terminal, is

3    "the leading North American port for automobile imports and exports."

4          3.      Plaintiffs seek to represent all persons and entities in the United States who

5    indirectly purchased from any Defendant or any current or former subsidiary or affiliate thereof,

6    or any co-conspirator, Vehicle Carrier Services for personal use and not for resale, incorporated

7    into the price of a new Vehicle purchased or leased during the period from and including January

8    2008 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class

9    Period").

10         4.      The Defendants provide, market, and/or sell Vehicle Carrier Services throughout

11   the United States.

12         5.      The Defendants, and their co-conspirators (as yet unknown), agreed, combined,

13   and conspired to fix, raise, maintain and/or stabilize prices and allocate the market and customers

14   in the United States for Vehicle Carrier Services.

15         6.      Competition authorities in the United States, the European Union, Canada and

16   Japan have been investigating a possible global cartel among Vehicle Carriers since at least

17   September, 2012. Both the Antitrust Division of the United States Department of Justice

18   ("DOJ") and Canada's Competition Bureau ("CCB") are investigating unlawful, anticompetitive

19   conduct in the market for ocean shipping of cars, trucks, construction equipment, and other

20   products. The Japanese Fair Trade Commission ("JFTC") and European Commission

21   Competition Authority ("EC") have also conducted coordinated dawn raids at the Tokyo and

22   European offices of several of the Defendants.

23         7.      Defendants and their co-conspirators participated in a combination and conspiracy

24   to suppress and eliminate competition in the Vehicle Carrier Services market by agreeing to fix,

25   stabilize, and maintain the prices of, Vehicle Carrier Services sold to vehicle manufacturers and

26   others in the United States. The combination and conspiracy engaged in by the Defendants and

27   their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce

28

CLASS ACTION COMPLAINT

1   in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, state antitrust, unfair competition, and

2   consumer protection laws, and the common law of unjust enrichment.

3       8.      As a direct result of the anticompetitive and unlawful conduct alleged herein,

4   Plaintiffs and the Classes paid artificially inflated prices for Vehicle Carrier Services

5   incorporated into the price of a new Vehicle purchased or leased during the Class Period, and

6   have thereby suffered antitrust injury to their business or property.

7                           II.     **JURISDICTION**

8       9.      This Court has subject matter jurisdiction of the federal antitrust claims asserted

9   in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§

10  1331 and 1337.  This Court has subject matter jurisdiction of the state law claims asserted in this

11  action under 28 U.S.C. §§ 1332(d) and 1367, in that the matter in controversy exceeds the sum of

12  $5 million exclusive of interest and costs, members of the plaintiffs class are citizens of states

13  different from defendants, and certain defendants are citizens or subjects of foreign states; and

14  the state claims are so related to the federal antitrust claims as to form part of the same case or

15  controversy under Article III of the United States Constitution.

16      10.     The Defendants engaged in conduct both inside and outside of the United States

17  that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects

18  upon interstate commerce within the United States.

19      11.     The activities of the Defendants and their co-conspirators were within the flow of,

20  were intended to, and did have, a substantial effect on interstate commerce of the United States.

21  The Defendants' Vehicle Carrier Services are sold in the flow of interstate commerce.

22      12.     Vehicles, the prices of which include Vehicle Carrier Services, transported from

23  abroad by the Defendants and sold for use within the United States are goods brought into the

24  United States for sale, and therefore constitute import commerce.  To the extent any such

25  Vehicles and the related Vehicle Carrier Services are purchased in the United States, and such

26  Vehicles or Vehicle Carrier Services do not constitute import commerce, the Defendants'

27  unlawful activities with respect thereto, as more fully alleged herein during the Class Period,

28

1    had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States

2    commerce.  The anticompetitive conduct, and its effect on United States commerce described

3    herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United

4    States.

5          13.      By reason of the unlawful activities hereinafter alleged, Defendants substantially

6    affected commerce throughout the United States, causing injury to Plaintiffs and members of the

7    Classes.  The Defendants, directly and through their agents, engaged in activities affecting all

8    states, to fix, raise, maintain and/or stabilize prices, and allocate the market and customers in the

9    United States for Vehicle Carrier Services, which conspiracy unreasonably restrained trade and

10   adversely affected the market for Vehicle Carrier Services.

11         14.      The Defendants' conspiracy and unlawful conduct described herein adversely

12   affected persons and entities in the United States who purchased Vehicle Carrier Services for

13   personal use and not for resale, including Plaintiffs and the members of the Classes.

14                              **III.    PARTIES**

15   **A.    Plaintiffs**

16         15.      The named plaintiffs and class representative are indirect purchasers in the state

17   of Minnesota of Vehicle Carrier Services from one or more of the defendants named herein or

18   their unnamed co-conspirators pursuant to the price fixing conspiracy alleged herein during the

19   Class Period.  Judy A. Reiber is a citizen of the state of Minnesota residing at 4821 10th Avenue

20   South, Minneapolis, Minnesota 55417.  On April 29, 2008, she bought a Hyundai Elantra and

21   thereby indirectly purchased Vehicle Carrier Services from one of the defendants or its co-

22   conspirators.  Plaintiff Craig Buske is a citizen of the State of Minnesota residing at 1105

23   California Avenue West, St. Paul, Minnesota 55108.  On July 15, 2008, he bought a 2008

24   Mazda3 i Touring Value and thereby indirectly purchased Vehicle Carrier Services from one of

25   the defendants or its co-conspirators.  Plaintiffs Elizabeth Allis and William Elwood are citizens

26   of the State of Minnesota residing at 2847 East Lake of the Isles Parkway, Minneapolis,

27

28

Minnesota 55408.  On October 5, 2007, they bought a 2008 Toyota Prius model 4H, and thereby indirectly purchased Vehicle Carrier Services from one of the defendants or its co-conspirators.

**B.   Defendants**

16.     Defendant NYK America is a New Jersey company with its principal place of business located at 300 Lighting Way, Secaucus, New Jersey, 07094.  NYK Line America is a wholly owned subsidiary of NYK Line. NYK America provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

17.     Defendant NYK Line is a Japanese company. NYK Line – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

18.     Defendant MOL is a Japanese company. MOL – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

19.     Defendant "K" Line is a Japanese company. "K" Line – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

20.     Defendant "K" Line America is a wholly owned subsidiary of "K" Line and a Virginia company. "K" Line America provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

21.     Defendant WW Holding is a Norwegian company. WW Holding – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

22.     Defendant WW ASA is a Norwegian company. WW ASA – directly and/or through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or

CLASS ACTION COMPLAINT

1 sold Vehicle Carrier Services throughout the United States, including in this District, during the

2 Class Period.

3      23.    Defendant EUKOR is a South Korean company. EUKOR – directly and/or

4 through its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or

5 sold Vehicle Carrier Services throughout the United States, including in this District, during the

6 Class Period.

7      24.    Defendant WWL is a Norwegian company. WWL – directly and/or through its

8 subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle

9 Carrier Services throughout the United States, including in this District, during the Class Period.

10      25.    Defendant WWL America is a wholly owned subsidiary of WWL and a Florida

11 company. WWL America provided, marketed and/or sold vehicle Carrier Services throughout

12 the United States, including in this District, during the Class Period.

13      26.    Defendant Wallenius is a Swedish Company. Wallenius – directly and/or through

14 its subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold

15 vehicle Carrier Services throughout the United States, including in this District, during the Class

16 Period.

17      27.    Defendant CSAV is a Chilean company. CSAV – directly and/or through its

18 subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle

19 Carrier Services throughout the United States, including in this District, during the Class Period.

20      28.    Defendant Toyofuji is a Japanese company. Toyofuji – directly and/or through its

21 subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle

22 Carrier Services throughout the United States, including in this District, during the Class Period.

23      29.    Defendant Nissan is a Japanese company. Nissan – directly and/or through its

24 subsidiaries, which it wholly owned and/or controlled – provided, marketed and/or sold Vehicle

25 Carrier Services throughout the United States, including in this District, during the Class Period.

26

27

28

CLASS ACTION COMPLAINT

## IV.  AGENTS AND CO-CONSPIRATORS

30.  Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

31.  Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

32.  Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## V.  FACTUAL ALLEGATIONS

### A.  The Vehicle Carrier Industry

33.  A RoRo ship is a special type of ocean vessel that allows wheeled Vehicles to be driven and parked on its decks for long voyages.  These ships, also known as Vehicle Carriers, have special ramps to permit easy access, high sides to protect the cargo during transport, and numerous decks to allow storage of a large number and variety of Vehicles.

34.  There are different types of RoRo ships. A Pure Vehicle Carrier (PCC) transports only cars and a Pure Car and Truck Carrier (PCTC) transports cars, trucks, and other four wheeled vehicles.  Although a RoRo ship cannot transport containers, some hybrid RoRo/container ships have been built.

7

CLASS ACTION COMPLAINT



WW ASA's MV Tønsberg RoRo vessel

35.     Vehicle Carriers are a defined submarket of the larger bulk shipping market. World trade exploded after the proliferation of container ships. These ships allow a large range of goods, such as food and consumer electronics, to be packed in standard-sized containers for quick loading and delivery. However, cars, trucks, and heavy machinery, due to their larger and more irregular shapes, are not easily shipped in containers. Furthermore, there are no reasonable substitutes for the shipment of Vehicles by sea because any alternatives, such as air transportation, would be too costly.

36.     For new Vehicles, the original equipment manufacturers ("OEMs") – mostly large automotive, construction and agricultural manufacturers – purchase Vehicle Carrier Services directly from the Defendants. The OEMs and Vehicle Carriers generally enter into long-term shipping arrangements.

37.     The Defendants and their co-conspirators provided Vehicle Carrier Services to OEMs for transportation of Vehicles sold in the United States and elsewhere. The Defendants and their co-conspirators provided Vehicle Carrier Services (a) in the United States for the transportation of Vehicles manufactured elsewhere for export to and sale in the United States,

CLASS ACTION COMPLAINT

1 | and (b) in other countries for the transportation of Vehicles manufactured elsewhere for export to

2 | and sale in the United States.

3 |      38.     Plaintiffs and members of the proposed Classes purchased Vehicle Carrier

4 | Services indirectly from one or more of the Defendants by virtue of their purchase or lease of a

5 | new Vehicle during the Class Period.

6 |      39.     The annual market for Vehicle Carrier Services in the United States is nearly a

7 | billion dollars. Specifically, for the transportation of new, imported motor vehicles manufactured

8 | elsewhere for export to and sale in the United States, the market is between $600 and $800

9 | million each year.

10 | **B.**    **The Market Structure and Characteristics Support the Existence of a Conspiracy**

11 |      40.     The structure and other characteristics of the market for Vehicle Carrier Services

12 | are conducive to a price-fixing agreement and have made collusion particularly attractive.

13 | Specifically, the Vehicle Carrier Services market: (1) has high barriers to entry; (2) has

14 | inelasticity of demand; (3) is highly concentrated; (4) is highly homogenized; (5) is rife with

15 | opportunities to meet and conspire; and (6) has excess capacity.

16 |      **1.**    **The Market for Vehicle Carrier Services Has High Barriers to Entry**

17 |      41.     A collusive arrangement that raises product prices above competitive levels

18 | would, under basic economic principles, attract new entrants seeking to benefit from the supra-

19 | competitive pricing. When, however, there are significant barriers to entry, new entrants are

20 | much less likely to enter the market. Thus, barriers to entry help facilitate the formation and

21 | maintenance of a cartel.

22 |      42.     There are substantial barriers that preclude, reduce, or make more difficult entry

23 | into the Vehicle Carrier Services market. Transporting Vehicles without damage across oceans

24 | requires highly specialized and sophisticated equipment, resources, and industry knowledge.

25 | The ships that make such transport possible are highly specialized. Such ships are purposely built

26 | to an unusual design that includes high sides, multiple interior decks, and no container cargo

27 | space. These characteristics restrict the use of the ships to the Vehicle Carrier Services market.

28 |

A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing or acquiring a fleet of Vehicle Carriers and other equipment, energy, transportation, distribution infrastructure, and skilled labor. It is estimated that the capital cost of a RoRo is at least $95 million.[1]

43.     Additionally, the nature of the Vehicle Carrier Services industry requires the establishment of a network of routes to serve a particular set of customers with whom Defendants establish long-term relationships. The existence of these established routes and long term contracts increases switching costs for shippers and present an additional barrier to entry.

44.     The Vehicle Carrier Services market also involves economies of scale and scope, which present additional barriers to entry.

(a)     Economies of scale exist where firms can lower the average cost per unit through increased production, since fixed costs are shared over a larger number of units. Fuel accounts for nearly 50% of all operational costs for Vehicle Carriers. However Vehicle Carriers are less sensitive to fuel prices than other modes of transportation, providing opportunities to exploit economies of scale. As fuel prices increased in the last 5-10 years, market participants were incentivized to increase the average size of vessels. This reflects the presence of economies of scale, because fuel costs did not increase proportionally as vessel size grew.

(b)     Economies of scope exist where firms achieve a cost advantage from providing a wide variety of products or services. The major Vehicle Carriers, including Defendants, own related shipping or transportation businesses they can utilize to provide additional services to clients, such as the operation of dedicated shipping terminals and inland transportation of Vehicles.

**2.     There is Inelasticity of Demand for Vehicle Carrier Services**

45.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In

---

[1] *Asaf Ashar, Marine Highways' New Direction*, J. OF COM. 38 (Nov. 21, 2011).

CLASS ACTION COMPLAINT

1  other words, customers have nowhere to turn for alternative, cheaper products of similar quality,

2  and so continue to purchase despite a price increase.

3      46.    For a cartel to profit from raising prices above competitive levels, demand must

4  be relatively inelastic at competitive prices.  Otherwise, increased prices would result in

5  declining sales, revenues, and profits as customers purchased substitute products or declined to

6  buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing

7  producers to raise their prices without triggering customer substitution and lost sales revenue.

8      47.    Demand for Vehicle Carrier Services is highly inelastic.  This is because there are

9  no close substitutes for this service.  A Vehicle Carrier is the only ocean vessel that has the

10  carrying capacity for a large number of Vehicles.  A Vehicle Carrier is also more versatile than

11  other substitutes because it is built to adjust to various shapes and sizes.  Because a container

12  ship functions based on the uniformity of the cargo—everything must fit within the standardized

13  containers—it is not conducive to transporting larger and more irregularly-shaped goods, such as

14  cars, trucks, and agricultural and construction equipment.  Foreign OEMs must employ Vehicle

15  Carrier Services to facilitate the sale of their Vehicles in North America, regardless of whether

16  prices are kept at supra-competitive levels.  There is simply no alternative for high volume

17  transoceanic transportation of Vehicles to the United States.

18      **3.    The Market for Vehicle Carriers Is Highly Concentrated**

19      48.    A concentrated market is more susceptible to collusion and other anticompetitive

20  practices.

21      49.    The Defendants dominate the global Vehicle Carrier Services market. Defendants

22  controlled over 70 percent of the Vehicle Carrier Services market during the Class Period.[2]

23

24

25

26

27

28  [2] Source: Hesnes Shipping AS, The Car Carrier Market 2010.

11

CLASS ACTION COMPLAINT



Source: Hesnes Shipping AS, The Car Carrier Market 2010

**4.**     **The Services Provided by Vehicle Carriers Are Highly Homogeneous**

50.     Vehicle Carrier Services are a commodity-like service, which is interchangeable among Vehicle Carriers.

51.     When products or services offered by different suppliers are viewed as interchangeable by purchasers, it is easier for suppliers unlawfully to agree on the price for the product or service in question, and it is easier effectively to police the collusively set prices. This makes it easier to form and sustain an unlawful cartel.

52.     Vehicle Carrier Services are qualitatively the same across different carriers.  Each Defendant has the capability to provide the same or similar Vehicle Carrier Services and Vehicle Carrier Service customers make purchase decisions based primarily on price.  The core considerations for a purchaser will be where, when, and how much.  This commoditization and interchangeability of Vehicle Carrier Services facilitated Defendants' conspiracy by making coordination on price much simpler than if Defendants had numerous distinct products or services with varying features.

12

CLASS ACTION COMPLAINT

**5.    Defendants Had Ample Opportunities to Meet and Conspire**

53.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  For example, there are frequent trade shows for shipping companies around the globe, such as the Breakbulk conferences[3] and the biennial RoRo trade show in Europe.

54.    Defendants "K" Line and NYK Line are also members of the Transpacific Stabilization Agreement (TSA), which consists of "major ocean container shipping lines that carry cargo from Asia to ports and inland points in the U.S." According to the TSA website, it provides a forum for its members to, *inter alia,*:

- Meet, exchange market information, and jointly conduct market research; ... and

- Develop voluntary, non-binding guidelines for rates and charges.

*See* About TSA at http://www.tsacarriers.org/about.html.  TSA meetings, which are ostensibly held to set rates for container shipping, provide an opportunity for its members, including Defendants "K" Line and NYK Line, to discuss Vehicle shipping markets, routes, and rates and engage in illegal price fixing, customer allocation and bid rigging conspiracies.  In fact, Defendants "K" Line, NYK Line, and MOL have already been fined by the DOJ, JFTC, EC, the Competition Bureau of Canada ("CCB"), and various other antitrust organizations for their roles in a conspiracy to fix air freight forwarding fees across several continents.

55.    Additionally, the Defendants routinely enter into joint "vessel sharing" or "space charter" agreements.  These agreements allow shipping lines to reserve amounts of space or

---

[3] Breakbulk Magazine provides its readers with project cargo, heavy lift and RoRo logistic sintelligence including news, trending, data and metrics. Breakbulk Magazine's global events include Breakbulk Transportation Conferences & Exhibitions, which "are the largest international events focused on traditional breakbulk logistics, heavy-lift transportation and project cargo trade issues." The conferences provide opportunities to "meet with specialized cargo carriers, ports, terminals, freight forwarders, heavy equipment transportation companies and packers." Source: http://www.breakbulk.com/breakbulk-global-events/.

13

CLASS ACTION COMPLAINT

"slots" on one another's ships. Vessel sharing agreements are very common in the international maritime shipping industry, comprising approximately 79% of all agreements registered with the Federal Maritime Commission ("FMC"). While allegedly entered into for space charter purposes, these agreements provide an opportunity for Defendants to discuss Vehicle shipping markets, routes, and rates and engage in illegal price fixing and bid rigging conspiracies.

56. The very nature of the negotiations between Vehicle Carriers and OEMs also facilitates collusion among Vehicle Carriers. Soren Tousgaard Jensen, Managing Director of WWL Russia has explained, using Japan as an example, "[T]he manufacturers there, in order to get the right frequency, the right market coverage and the right ports, have often called in two, three, sometimes four shipping lines around the table and said that

> they would spread their volumes between them, depending on how competitive they were. The shipping lines have to work together to find ways of not having ships in the same position and ways of having one line deliver at the beginning of the month and another mid-month.[4]

### 6. The Market for Vehicle Carrier Services Has Excess Capacity

57. Excess capacity occurs when a market is capable of supplying more of a product or service than is needed. This often means that demand is less than the output the market has the capability to produce. Academic literature suggests, and courts have found, that the presence of excess capacity can facilitate collusion.[5] Significantly, the market for Vehicle Carrier Services has operated in a state of excess capacity since 2008. The tables below demonstrate that while the capacity of Vehicle Carriers to transport Vehicles has increased since 2007, the utilization rate of Vehicle Carriers has fallen, and remained stable at a rate of approximately 83% since 2010.

---

[4] *Profitability the key issue for RoRo carriers*, AUTO. SUPPLY CHAIN (Oct. 4, 2012), *available at* http://www.automotivesupplychain.org/features/133/77/Profitability-the-key-issue-for-RoRocarriers/.

[5] *See* Benoit, J. and V. Krishna, *Dynamic Duopoly: Prices and Quantities*, REV. OF ECON. STUDIES, 54, 23-36 (1987); Davidson, Carl & Raymond Deneckere, *Excess Capacity and Collusion*, INT'L ECON. REV., 31(3), 521-41 (1990); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 657 (7th Cir. 2002).



Source: The Car Carrier Market, 2004-2012; Hesnes Shipping AS

Source: The Platou Report 2004-2012

58.     In the face of such excess capacity, Defendants agreed to reduce capacity and increase prices through coordinated "slow steaming."  Slow steaming involves lowering a carrier's speed to conserve on fuel costs.  NYK Line, for example, has used slow steaming for container ships and Vehicle Carriers since 2010.  By elongating the time it takes to make ocean crossings, Vehicle Carriers are able to use more ships at the same time, thereby decreasing capacity and creating artificial capacity shortages.

59.     In 2011, the Federal Maritime Commission ("FMC") opened an investigation into slow steaming after reportedly receiving complaints from shippers.[6]  Roy Pearson, deputy

---

[6] Specifically, the FMC is investigating the "economic effects" of slow steaming to determine whether it is causing "unreasonable constraints" on the international supply chain.

CLASS ACTION COMPLAINT

director of the FMC's Bureau of Trade Analysis, told the FMC that academic studies of slow steaming showed carriers could save $3 billion per year in fuel costs.[7]  As part of its investigation, the FMC issued a Notice of Inquiry soliciting public comment on the impact of slow steaming on United States ocean liner commerce.  In response, the National Industrial Transportation League, an association representing shippers, commented that despite the cost savings generated by slow steaming, many League members had actually "experienced increased shipping costs . . . ."[8]

60.    Defendants' practices of slow steaming and vessel sharing represent concerted, collusive efforts to reduce output in order to increase prices despite overcapacity in the Vehicle Carrier Services market. By acting in concert pursuant to their conspiracy, Defendants decreased the availability of Vehicle Carrier Services in the market, which caused prices to rise artificially during the Class Period.

**C.    There Is Strong Evidence of Collusion in the Vehicle Carrier Services Market**

**1.    Defendants Raised Prices at a Rate that Far Exceeded Demand**

61.    Prices for Vehicle Carrier Services have been generally increasing since 2006.



[7] R.G. Edmonson, *FMC to Review Slow Steaming*, J. OF COM. (Jan. 7, 2011), *available at* http://www.joc.com/maritime-news/fmc-review-slow-steaming_20110107.html.

[8] Comments of The National Industrial Transportation League to the FMC's Notice of Inquiry Solicitation of Views on the Impact of Slow Steaming (Apr. 5, 2011), *available at* http://www.fmc.gov/noi-slow_steaming/.

16

62.     As the graph above demonstrates, pricing for Vehicle Carrier Services (per vehicle) remained relatively flat from 2001 to 2006. In 2001, the per vehicle price was approximately $301.30, while in 2006 the per vehicle price was $305.79, an increase of less than 2%.

63.     Beginning just prior to the Class Period, the price of Vehicle Carrier Services has increased by 23%.

64.     The increase in the price of Vehicle Carrier Services far outpaced any increase in demand during the Class Period.

65.     In the absence of an unlawful price-fixing conspiracy, according to the laws of supply and demand, prices would not increase at a rate greater than the rate of demand, yet that is exactly what happened in the Vehicle Carrier Services market during the Class Period.

## 2.     **Defendants Previously Colluded in Different Markets**

66.     The affiliates and subsidiaries of certain Defendants have recently pleaded guilty and agreed to pay millions of dollars in fines for violating the antitrust laws in other markets.

67.     In 2007, the DOJ and EC launched an investigation into price fixing among international air freight forwarders, including certain affiliates and subsidiaries of Defendants. On October 10 of that year, the EC launched unannounced inspections at the premises of various international air freight forwarding companies with the help and coordination of various other nations' antitrust enforcement groups.

68.     On March 19, 2009, the JFTC ordered 12 companies to pay $94.7 million in fines for violations of the Japanese Antimonopoly Act ("AMA"). Included among the 12 companies were "K" Line Logistics, Ltd., a subsidiary of Defendant "K" Line, Yusen Air & Sea Services Co., Ltd., a subsidiary of Defendant NYK Line, and MOL Logistics (Japan) Co., Ltd., a subsidiary of Defendant MOL.

69.     The JFTC concluded that the companies had, over a five-year period, met and agreed to, among other things, the amount of fuel surcharges, security charges, and explosive inspection charges that they would charge their international air freight forwarding customers.

The agreements were, according to the JFTC, negotiated at meetings of the Japan Aircargo Forwarders Association.

70.     Yusen Logistics Co., Ltd.[9] filed a complaint in April 2009 requesting a hearing to review the JFTC's orders, and the Tokyo High Court upheld the orders on November 9, 2012.

71.     On September 30, 2011, MOL Logistics (Japan) Co., Ltd. pleaded guilty to a Criminal Information in the United States District Court for the District of Columbia charging it with Sherman Act violations related to price fixing.  MOL is one of 16 companies that agreed to plead guilty or have pleaded guilty as a result of the DOJ's freight forwarding investigation, which has resulted in more than $120 million in criminal fines to date. According to the Criminal Information filed against MOL Logistics (Japan) Co. Ltd., it and its co-conspirators accomplished their conspiracy by:

(a)     Participating in meetings, conversations, and communications to discuss certain components of freight forwarding service fees to be charged on air cargo shipments from Japan to the United States;

(b)     Agreeing, during those meetings, conversations, and communications, on one or more components of the freight forwarding service fees to be charged on air cargo shipments from Japan to the United States;

(c)     Levying freight forwarding service fees, and accepting payments for services provided for, air cargo shipments from Japan to the United States, in accordance with the agreements reached; and

(d)     Engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon freight forwarding service fees.

72.     On March 28, 2012, the EC fined 14 international groups of companies, including Yusen Shenda Air & Sea Service (Shanghai) Ltd., a subsidiary of Defendant NYK Line, a total

---

[9] On October 1, 2010, Yusen Air & Sea Services Co., Ltd. and NYK Logistics merged under the name Yusen Logistics Co., Ltd.

1  of $219 million for their participation in the air cargo cartels and violating European Union

2  antitrust rules.  According to the EC, "[i]n four distinct cartels, the cartelists established and

3  coordinated four different surcharges and charging mechanisms, which are component elements

4  of the final price billed to customers for these services."

5       73.    On March 8, 2013, the DOJ announced that "K" Line Logistics, Ltd. and Yusen

6  Logistics Co., Ltd., a subsidiary of Defendant NYK Line, agreed to pay criminal fines of

7  $3,507,246 and $15,428,207, respectively, for their roles in a conspiracy to fix certain freight

8  forwarding fees for cargo shipped by air from the United States to Japan.  As with MOL

9  Logistics (Japan) Co. Ltd., "K" Line Logistics, Ltd. and Yusen Logistics Co., Ltd. pleaded guilty

10  to meeting with co-conspirators, agreeing to what freight forwarding service fees should be

11  charged on air cargo shipments, and actually levying those fees on its customers from about

12  September 2002 until at least November 2007.

### 3.   Competition Authorities Have Launched and Coordinated a Global Government Investigation into Price-Fixing in the Market for Vehicle Carrier Services

15       74.    United States, Canadian, Japanese, and European competition authorities have

16  initiated a global, coordinated antitrust investigation concerning the unlawful conspiracy alleged

17  herein. The investigation originated in the United States after an American shipping company

18  complained of Defendants' conspiracy to the DOJ.

19       75.    On September 6, 2012, the JFTC executed raids at the Japanese offices of NYK

20  Line, MOL, "K" Line, WWL, and EUKOR as part of an investigation into anticompetitive

21  conduct related to Vehicle Carrier Services.  Defendant "K" Line confirmed in a statement to its

22  shareholders, as part of its FY2012 2nd Quarter report, that it was visited by a JFTC

23  investigation team on suspicion of violating Japan's Antimonopoly Act in terms of transporting

24  cars and wheeled construction machinery. Defendants NYK Line and MOL further confirmed

25  that their Japanese offices had been searched.

26       76.    *The Japan Daily Press* reported that a JFTC official said the cartel "was formed to

27  deal with the rising fuel charges, personnel costs and shipbuilding expenses."  According to the

28

1    article, "apparently some companies formed smaller groups for specific shipping routes, such as

2    for Europe, North America and other Asian nations" and the three major Japanese firms – NYK

3    Line, "K" Line and MOL – played "a big role in this setup." "The scrupulous companies were

4    controlling the competition and manipulating transport orders from carmakers."

5           77.    Defendant WW ASA confirmed in a press release on September 7, 2012 that it

6    had received a request for information from the CCB, and that (i) its subsidiaries, WWL and

7    EUKOR had been visited by the JFTC as part of an investigation related to the Japan

8    Antimonopoly Act; (ii) WWL had received requests for information from the EC, DOJ and

9    CCB; and (iii) EUKOR had received requests for information from the DOJ and the CCB.

10   According to Defendant WW ASA, the purpose of the requests made to WWL and EUKOR "is

11   to ascertain whether there is evidence of any infringement of competition law related to possible

12   price cooperation between carriers and allocation of customers."

13          78.    On the same day, in coordination with United States and Japanese authorities, the

14   EC carried out additional unannounced inspections at the European offices of several maritime

15   shipping companies suspected of operating a cartel. According to the EC, it carried out the

16   inspections in coordination with United States and Japanese competition authorities, and "ha[d]

17   reasons to believe that the companies concerned may have violated Article 101 of the [Treaty on

18   the functioning of the European Union] TFEU prohibiting cartels and restrictive business

19   practices."

20          79.    *The Japanese Business Daily* reported that the shipping affiliates of Toyota Motor

21   Corp. and Nissan Motor Co. were also among the companies raided by the JFTC. Toyota Motor

22   Corp.'s shipping affiliate is Defendant ToyoFuji, and Nissan Motor Co.'s is Defendant Nissan.

23          80.    Defendant CSAV issued a statement in mid-September revealing that its

24   employees had received subpoenas from the DOJ and CCB in connection with the suspected

25   Vehicle Carrier Services cartel. Defendant CSAV stated, "[t]he investigation seeks to inquire

26   into the existence of antitrust law violations related to cooperation agreements on prices and

27   allocation of clients between car carriers."

28

CLASS ACTION COMPLAINT

81. The DOJ, through spokesperson Gina Talamona, confirmed to the media shortly after the September 2012 raids, "We are coordinating with the European Commission, the Japanese Fair Trade Commission and other international competition authorities." Ms. Talamona explained that "[t]he antitrust division is investigating the possibility of anticompetitive practices involving the ocean shipping of cars, trucks, construction equipment, and other products."

## VI. CLASS ACTION ALLEGATIONS

82. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who indirectly purchased from any Defendant or any current or former subsidiary or affiliate thereof, or any coconspirator, Vehicle Carrier Services for personal use and not for resale, incorporated into the price of a new Vehicle purchased or leased during the Class Period.

83. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust laws of the State of Minnesota on behalf of the following class (the "Damages Class"):

> All persons and entities in the State of Minnesota who indirectly purchased, from any Defendant or any current or former subsidiary or affiliate thereof, or any coconspirator, Vehicle Carrier Services for personal use and not for resale, incorporated into the price of a new Vehicle purchased or leased during the Class Period.

84. The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Vehicle Carrier Services directly.

85. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

21

CLASS ACTION COMPLAINT

86. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Vehicle Carrier Services sold in the United States;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e) Whether the alleged conspiracy violated state antitrust law as alleged in the Second Claim for Relief;

(f) Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

(g) Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h) The effect of the alleged conspiracy on the prices of Vehicle Carrier Services sold in the United States during the Class Period;

(i) Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j) Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

22

CLASS ACTION COMPLAINT

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

87.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Vehicle Carrier Services purchased indirectly from the Defendants and/or their co-conspirators.

88.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

89.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

90.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

91.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

CLASS ACTION COMPLAINT

## VII.   PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

92.     The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Vehicle Carrier Services;

(b)     The prices of Vehicle Carrier Services have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of Vehicle Carrier Services have been deprived of free and open competition;

(d)     Indirect purchasers of Vehicle Carrier Services paid artificially inflated prices.

93.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Vehicle Carrier Services. OEMs and automobile dealers passed on the inflated charges to purchasers and lessees of new Vehicles.  Those overcharges have unjustly enriched Defendants.

94.     The market for Vehicle Carrier Services and the market for Vehicles are inextricably linked and intertwined because the market for Vehicle Carrier Services exists to serve the Vehicle market.  Without the Vehicles, the Vehicle Carrier Services have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Vehicle Carrier Services.

95.     While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The OEM and dealer markets for new Vehicles are subject to vigorous price competition.  The OEMs and dealers have thin net margins, and are therefore at the mercy of their input costs, such that increases in the price of Vehicle Carrier Services lead to corresponding increases in prices for new Vehicles at the OEM and dealer levels.  When downstream distribution markets are highly competitive, as they are in the case of new Vehicles

1  shipped by Vehicle Carrier, overcharges are passed through to ultimate consumers, such as the

2  indirect-purchaser Plaintiffs and the members of the Classes.

3       96.    Hence, the inflated prices of Vehicle Carrier Services in new Vehicles resulting

4  from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other

5  members of the Classes by OEMs and dealers.

6       97.    The purpose of the conspiratorial conduct of the Defendants and their

7  coconspirators was to raise, fix, rig, or stabilize the price of Vehicle Carrier Services and, as a

8  direct and foreseeable result, the price of new Vehicles shipped by Vehicle Carriers.

9       98.    Economists have developed techniques to isolate and understand the relationship

10  between one "explanatory" variable and a "dependent" variable in those cases when changes in

11  the dependent variable are explained by changes in a multitude of variables, even when all such

12  variables may be changing simultaneously. That analysis - called regression analysis – is

13  commonly used in the real world and in litigation to determine the impact of a price increase on

14  one cost in a product (or service) that is an assemblage of costs.

15       99.    Regression analysis is one potential method by which to isolate and identify only

16  the impact of an increase in the price of Vehicle Carrier Services on prices for new purchased or

17  leased Vehicles even though such products contain a number of other inputs whose prices may

18  be changing over time.  A regression model can explain how variation in the price of Vehicle

19  Carrier Services affects changes in the price of new purchased or leased Vehicles.  In such

20  models, the price of Vehicle Carrier Services would be treated as an independent or explanatory

21  variable.  The model can isolate how changes in the price of Vehicle Carrier Services impact the

22  price of new Vehicles shipped by Vehicle Carrier while controlling for the impact of other price-

23  determining factors.

24       100.    The precise amount of the overcharge impacting the prices of new Vehicles

25  shipped by Vehicle Carrier can be measured and quantified.  Commonly used and well-accepted

26  economic models can be used to measure both the extent and the amount of the supra-

27

28

CLASS ACTION COMPLAINT

1 | competitive charge passed-through the chain of distribution.  Thus, the economic harm to

2 | Plaintiffs and the members of the Classes can be quantified.

3 |      101.    By reason of the alleged violations of the antitrust laws and other laws alleged

4 | herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or

5 | property, having paid higher prices for Vehicle Carrier Services than they would have paid in the

6 | absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have

7 | suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that

8 | the antitrust laws were meant to punish and prevent.

## VIII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Her Claims**

     102.    Plaintiffs repeat and re-allege the allegations set forth above.

     103.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the filing of this Complaint.  Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 6, 2012, the date the JFTC announced raids of certain Defendants' offices for their role in the criminal price-fixing conspiracy alleged herein.

     104.    Plaintiffs and members of the Classes are consumers who had no direct contact or interaction with the Defendants, and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the September 6, 2012 raids alleged above.

     105.    No information in the public domain was available to Plaintiffs and members of the Classes prior to the announced raids on September 6, 2012 that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to fix the

CLASS ACTION COMPLAINT

1 | prices charged for Vehicle Carrier Services. Plaintiffs and members of the Classes had no means

2 | of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs

3 | or other direct purchasers, much less the fact that they had engaged in the combination and

4 | conspiracy alleged herein.

5 | 106. For these reasons, the statute of limitations as to Plaintiffs' and the Classes'

6 | claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and

7 | members of the Classes have alleged in this Complaint.

8 | **B.** **Fraudulent Concealment Tolled the Statute of Limitations**

9 | 107. In the alternative, application of the doctrine of fraudulent concealment tolled the

10 | statute of limitations as to the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and

11 | members of the Classes did not know and could not have known of the existence of the

12 | conspiracy and unlawful combination alleged herein until September 6, 2012, at the earliest, the

13 | date the JFTC announced raids of certain Defendants' offices for their role in the criminal price-

14 | fixing conspiracy alleged herein.

15 | 108. Before that time, Plaintiffs and members of the Classes were unaware of

16 | Defendants' unlawful conduct, and did not know before then that they were paying supra-

17 | competitive prices for Vehicle Carrier Services throughout the United States during the Class

18 | Period. No information, actual or constructive, was ever made available to Plaintiffs and

19 | members of the Classes that even hinted to Plaintiffs and the members of the Classes that they

20 | were being injured by Defendants' unlawful conduct.

21 | 109. The affirmative acts of the Defendants alleged herein, including acts in

22 | furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

23 | precluded detection.

24 | 110. By its very nature, the Defendants' anticompetitive conspiracy and unlawful

25 | combinations were inherently self-concealing. Defendants met and communicated in secret and

26 | agreed to keep the facts about their collusive conduct from being discovered by any member of

27 | the public or by the OEMs and other direct purchasers with whom they did business.

28 |

CLASS ACTION COMPLAINT

111.    Plaintiffs and members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their coconspirators to avoid detection of, and fraudulently conceal, their conduct.

112.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 6, 2012, when the JFTC announced raids of certain Defendants' offices for their role in the criminal price-fixing conspiracy alleged herein.

113.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until September 6, 2012.

**FIRST COUNT FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

114.    Plaintiffs repeat and re-allege the allegations set forth above.

115.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

116.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

117.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, stabilize, and control prices for Vehicle Carrier Services, thereby creating anticompetitive effects.

118.    The anticompetitive acts were intentionally directed at the United States market for Vehicle Carrier Services and had a substantial and foreseeable effect on interstate commerce

1  and on United States import and export commerce by raising and fixing prices for Vehicle

2  Carrier Services throughout the United States and worldwide.

3       119.    The conspiratorial acts and combinations have caused unreasonable restraints in

4  the market for Vehicle Carrier Services.

5       120.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly

6  situated indirect purchasers in the Nationwide Class who purchased Vehicle Carrier Services

7  have been harmed by being forced to pay inflated, supra-competitive prices for Vehicle Carrier

8  Services.

9       121.    In formulating and carrying out the alleged agreement, understanding, and

10  conspiracy, Defendants and their co-conspirators did those things that they combined and

11  conspired to do, including but not limited to the acts, practices, and course of conduct set forth

12  herein.

13       122.    Defendants' conspiracy had the following effects, among others:

14            (a)    Price competition in the market for Vehicle Carrier Services has been

15  restrained, suppressed, and/or eliminated in the United States;

16            (b)    Prices for Vehicle Carrier Services provided by Defendants and their

17  coconspirators have been fixed, raised, maintained, and stabilized at artificially high,

18  noncompetitive levels throughout the United States; and

19            (c)    Plaintiffs and members of the Nationwide Class who purchased Vehicle

20  Carrier Services indirectly from Defendants and their co-conspirators have been deprived of the

21  benefits of free and open competition.

22       123.    Plaintiffs and members of the Nationwide Class have been injured and will

23  continue to be injured in their business and property by paying more for Vehicle Carrier Services

24  purchased indirectly from Defendants and the co-conspirators than they would have paid and

25  will pay in the absence of the conspiracy.

26       124.    The alleged contract, combination, or conspiracy is a per se violation of the

27  federal antitrust laws.

28

29

CLASS ACTION COMPLAINT

1    125.    Plaintiffs and members of the Nationwide Class are entitled to an injunction

2    against Defendants, preventing and restraining the violations alleged herein.

3    **SECOND COUNT FOR RELIEF**
**Violation of Minnesota Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

4

5    126.    Plaintiffs repeat and re-allege the allegations set forth above.

6    127.    During the Class Period, Defendants and their co-conspirators engaged in a

7    continuing contract, combination, or conspiracy with respect to the provision of Vehicle Carrier

8    Services in unreasonable restraint of trade and commerce and in violation of the antitrust laws of

9    the State of Minnesota, Minnesota Stat. §§ 325D.52, *et seq.*

10    128.    The contract, combination, or conspiracy consisted of an agreement among the

11    Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially

12    supra-competitive prices for Vehicle Carrier Services and to allocate customers for Vehicle

13    Carrier Services in the United States.

14    129.    In formulating and effectuating this conspiracy, Defendants and their

15    coconspirators performed acts in furtherance of the combination and conspiracy, including:

16    (a)    participating in meetings and conversations among themselves in the

17    United States and elsewhere during which they agreed to price Vehicle Carrier Services at

18    certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid

19    by Plaintiffs and members of the Damages Class with respect to Vehicle Carrier Services

20    provided in the United States;

21    (b)    allocating customers and markets for Vehicle Carrier Services provided in

22    the United States in furtherance of their agreements; and

23    (c)    participating in meetings and conversations among themselves in the

24    United States and elsewhere to implement, adhere to, and police the unlawful agreements they

25    reached.

26

27

28

CLASS ACTION COMPLAINT

130.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices and to allocate customers with respect to Vehicle Carrier Services.

131.    Defendants' combinations or conspiracies had the following effects: (1) Vehicle Carrier Services price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Vehicle Carrier Services prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Vehicle Carrier Services.

132.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

133.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

134.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, et seq.

### THIRD COUNT FOR RELIEF
#### Unjust Enrichment
#### (on behalf of Plaintiffss and the Damages Class)

135.    Plaintiffs repeat and re-allege the allegations set forth above.

136.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Vehicle Carrier Services.

137.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for Vehicle Carrier Services.

138.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs as the designated Class Representatives and their counsel as Class Counsel;

B.    Defendants have engaged in a contract, combination, and/or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Minnesota antitrust laws as set forth in Minnesota Stat. §§ 325D.52, *et seq.*, and Minnesota common law of unjust enrichment, and that Plaintiffs and the Class have been injured in their businesses and property as a result of Defendants' violations;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.    Plaintiffs and the members of the Class may recover damages sustained by them, as provided by the Minnesota antitrust laws and Minnesota common law of unjust enrichment, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.    Plaintiffs and the members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

CLASS ACTION COMPLAINT

F.     Plaintiffs and the members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     Plaintiffs and the members of the Class receive such other and further relief as may be just under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  July 12, 2013

By: _Francis O. Scarpulla_

Francis O. Scarpulla (41059)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile:  (415) 693-0770
*fscarpulla@zelle.com*

Daniel R. Shulman (MN 100651)
GRAY, PLANT, MOOTY, MOOTY & BENNETT
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 632-3335
Facsimile:  (612) 632-4335
*daniel.shulman@gpmlaw.com*

*Attorneys for Plaintiffs*

3247682v1

33
CLASS ACTION COMPLAINT